Alan A. Meda (#009213)
BURCH & CRACCHIOLO, P.A.
1850 N. Central Ave., Suite 1700
Phoenix, AZ 85004
Tel: 602.274.7611
ameda@bcattorneys.com

*Counsel for Debtor*

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re | Chapter 11 Subsection V |
| PAUL OLIVA PARADIS, | Case No.: 2:20-bk-06724-PS |
| Debtor. | **Amended Plan of Reorganization for Small Business Debtor Under Chapter 11** |
| | **Official Form 425A - Modified** |

### Paul Olivia Paradis's Amended Plan of Reorganization

### dated November 25, 2020

Debtor Paul Olivia Paradis's ("Debtor") Amended Plan of Reorganization dated November 25, 2020 (the "Plan") is for a small business debtor under Chapter 11, Subchapter V, of the United States Bankruptcy Code.[1] 11 U.S.C. § 1190 requires that the Plan include "(A) a brief history of the business operations of the debtor; (B) a liquidation analysis; and (C) projections with respect to the ability of the debtor to make payments under the proposed plan of reorganization.". In this case, James C. Cross has been appointed as the Sub-Chapter V Trustee (the "SubV Trustee").

## I.    BACKGROUND FOR CASES FILED UNDER SUBCHAPTER V.

### A.    Description and History of the Debtor's Business

Paul O. Paradis ("Paradis" or "Debtor") is an attorney and the sole owner of a project management and cyber security consulting company known as Ardent Cyber

---

[1] Unless otherwise noted herein, all statutory and rule references are to Title 11 of the United States Code, 11 U.S.C. § 101 *et seq*. (the "Bankruptcy Code") and to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

Solutions, LLC ("Ardent"). The events detailed herein caused both the Debtor and Ardent to seek protection under Chapter 11 of the Bankruptcy Code on June 3, 2020.

The Debtor understands that federal prosecutors from the United States Department of Justice ("DOJ") have now twice appeared before this Court and respectfully requested that the Court issue an Order staying discovery of the Debtor that would cause Debtor to reveal certain factual information known to the Debtor because disclosure of these facts would be highly detrimental to the integrity of the ongoing federal investigation. On August 17, 2020, in response to the DOJ's request, this Court issued an Order staying all discovery concerning: (i) any contracts between the Los Angeles Department of Water and Power ("LADWP") and Debtor, Paradis Law Group ("PLG"), Aventador Utility Solutions, LLC ("Aventador") and Ardent and (ii) certain pending litigations and arbitrations.

To comply with this Court's August 17th Order and in continuing deference to the DOJ's request, the Debtor respectfully furnishes the following statements set forth in paragraphs 1-11 below to provide the Court with information the Court requires to understand the events that led both the Debtor, and Ardent, to seek bankruptcy protection in June 2020. Debtor anticipates being able to provide the Court with an even more fulsome statement of background events once the DOJ completes its ongoing criminal investigation and Debtor therefore respectfully requests that he be provided with the opportunity to do so should the Court require additional background information in the future.

1.     **The City of Los Angeles Hired Debtor as Special Counsel to the City to Prosecute a Lawsuit Filed by the City Against PricewaterhouseCoopers, LLP.**

In 2010, PricewaterhouseCoopers, LLP ("PwC") was retained by the City of Los Angeles (the "City") to develop and implement a new billing system ("CC&B Billing System") for the LADWP, which is the largest municipal utility in the United States. The LADWP's CC&B Billing System went live in September 2013 and, as widely reported publicly, PwC's implementation of this system for the LADWP was disastrous and

resulted in more than 700 defects in this CC&B Billing System and an overwhelming number of delayed, inconsistent and inaccurate bills being issued to LADWP customers for more than a year.

In response, in December 2014, the City retained attorneys Paul Kiesel ("Kiesel") and the Paul Paradis to serve as Special Counsel to the City of Los Angeles ("Special Counsel") and prosecute an action for fraud and breach of contract against *PwC* on behalf of the City (the "*PwC* Action").[2] That lawsuit was filed in Los Angeles County Superior Court on March 6, 2015 and assigned to Superior Court Judge Elihu Berle.

On April 1, 2015, the City was sued by LADWP customer and ratepayer Antwon Jones ("Jones") in an action entitled *Jones v. City of Los Angeles*, (the "*Jones* Class Action"). The *Jones* Class Action was also assigned to Superior Court Judge Elihu Berle. The complaint in the *Jones* Class Action alleged that the plaintiff and thousands of other LADWP customers had been overcharged for electric and water utility services provided by the City because the bills generated by the improperly implemented CC&B Billing System were charging LADWP customers for more electricity and water than they had actually consumed. In August 2015, the City announced that it had entered into a class action settlement of the claims asserted in the *Jones* Class Action pursuant to which the City would, *inter alia*, refund all amounts owed to customers as a result of billing overcharges and remediate the billing system and in July 2017, Judge Berle finally approved that class action settlement.

---

[2] The *PwC* Action was entirely conceived of and instigated by Los Angeles Chief Assistant City Attorney James P. Clark ("Clark") in December 2014. At the time Clark conceived of the filing of the *PwC* Action and instigated its filing in March 2015, Clark was a retired Partner of Gibson Dunn -- and PwC had been an ongoing client of the Gibson Dunn firm since at least as early as 2006.

## 2. **In October 2015, the City Hired Debtor As "Project Manager" To Manage the Software Engineering Team Responsible for Remediating the LADWP's Defectively Implemented Customer Billing System.**

Because Debtor conducted an intensive investigation into the specific defects that plagued the LADWP's CC&B Billing System in connection with his work as Special Counsel, Debtor acquired very unique knowledge concerning the LADWP's new CC&B Billing System and what it would take to fix that billing system.[3] In light of Debtor's unique knowledge, LADWP executives and City Attorneys assigned to work at the LADWP repeatedly requested that Debtor accept work as a senior management level employee of the LADWP. When Debtor refused to do so, these same City officials requested that Debtor agree to work as an independent contractor to the City and LADWP and that he project manage the CC&B Billing system remediation team as an independent contractor.

After several weeks of discussions, on or about October 19, 2015, Debtor accepted the LADWP's offer to become an independent contractor to the City and LADWP and to project manage the billing system remediation team as an independent contractor who reported directly to the LADWP General Manager and Board of Commissioners.[4]

Over the course of the next year, Debtor worked tirelessly to lead and manage the LADWP's billing system remediation team and worked closely with LADWP IT personnel, software engineers and Oracle Inc. software engineers on a daily basis to create a systematic and prioritized remediation plan that was used to remediate the Oracle CC&B billing software that PwC had improperly implemented at the LADWP.

---

[3] Debtor's unique knowledge concerning the LADWP CC&B Billing System and the defects that plague that system were expressly recognized by the LADWP Board of Commissioners and LADWP executives as the reason Debtor was asked to accept employment and hired as the Project Manager by the City. The October 20, 2015 LADWP Board Meeting Minutes confirm this and state in relevant part, "no others have greater familiarity with the underlying issues required to oversee implementation of the measures than Paradis Law Group, PLLC." *See* <u>Exhibit A</u> hereto.

[4] This $1.2 million contract is the ***Los Angeles Department of Water and Power Professional Services Agreement No. 47361-6*** dated October 19, 2015 and is attached as <u>Exhibit B</u> hereto.

Throughout the course of the remediation project, Debtor frequently met with LADWP executives, members of the LADWP Board, numerous attorneys in the City Attorney's Office, and members of the Mayor's office, to report on the progress of the remediation team's efforts, as well as any challenges or issues that the remediation team had encountered. Debtor's ability to motivate and lead the remediation team was frequently lauded and Debtor was repeatedly congratulated on having been able to lead the team to remediate so many billing system defects – many of them critical -- in such a relatively short amount of time. Debtor was also repeatedly applauded for his candor and for making sure that all of the individuals to whom Debtor reported had accurate and timely information with which to make decisions – even when that information was negative.

By late summer 2016, after working intensively with Oracle and internal LADWP software engineers, analysts and others with expertise and knowledge of Oracle's CC&B software, Debtor and the 30+ person team he managed daily had achieved great success.

3. **The LADWP Failed to "Patch" and Maintain Mission Critical Informational and Operational Computer Systems.**

While working on the CC&B Billing System remediation project to remediate Version 2.3 of Oracle Corp.'s CC&B billing software (the version of the Oracle software that had been defectively implemented at the LADWP by PwC) ("CC&B Version 2.3"), Oracle personnel, working with certain other independent contractors hired to assess certain of the LADWP's systems, informed the LADWP Board and executive management that the LADWP's cyber hygiene was substandard.

At LADWP's request, Debtor agreed to – and did -- form Aventador in March 2017. At an LADWP Board meeting on June 6, 2017, the LADWP General Manager presented the LADWP Board with the proposed Aventador contract. The LADWP Board then unanimously voted to approve the Aventador contract in a 5-0 vote and created a special sub-committee of the LADWP Board to supervise and approve all of the work performed by Aventador employees under that contract. This sub-committee was comprised of the LADWP Board President and Vice President. In addition, the Aventador

contract was thoroughly vetted and approved as to form and legality by both the City Attorney's Office as well as the City's Ethic's Commission.

Following formal contract approval, Aventador hired several of the top cyber systems experts in the United States, many of whom had previously been employed by the National Security Agency and/or United States Department of Energy and who therefore had extensive experience working with sophisticated and arcane SCADA systems that are commonly utilized to operate critical infrastructure used to provide electrical and water service. Aventador's team quickly gained acceptance among LADWP personnel and were frequently requested to assist LADWP personnel in a vast number of situations in a number of LADWP environments.

Notably, the LADWP Board President commented publicly on the highly qualified team that Aventador provided to the LADWP during several LADWP Commission meetings and the Mayor personally requested that the Aventador team provide cyber assistance to at least two other Departments of the City in recognition of the team's unmatched cyber skill set. Aventador also complied with the extraordinary oversight requirement imposed by the LADWP Board by participating in routinely scheduled meetings at the LADWP Board President office in Century City, California to discuss Aventador's work plan and progress in remediating system issues at the LADWP – and many of those meetings were also attended by the LADWP General Manager.

### 4. PwC Publicly Alleges That Special Counsel Had Colluded With Class Counsel in the Jones Class Action, Damaging Debtor.

In March 2018, PwC sought summary dismissal of the City's claims and moved for summary judgment in the *PwC* Action, which the City opposed. On October 15, 2018, Judge Elihu Berle of the Los Angeles County Superior Court denied PwC's Motion for Summary Judgment and ordered that the City's claims against PwC for the botched implementation of the CC&B System proceed to trial.

Having failed to defeat the City's fraudulent inducement claims through summary judgment, PwC and its counsel, Gibson Dunn, embarked on a strategy designed to focus

on its adversary's counsel's actions, rather than on its client's misdeeds. In connection with this strategy, PwC asserted allegations against Debtor and his co-counsel in the *PwC Action*. PwC and Gibson Dunn alleged that Special Counsel had colluded with Class Counsel in the *Jones* Class Action to impose the cost of the $67+ million in refunds that the LADWP had repaid to customers it had overcharged in connection with the settlement in the *Jones* Class Action, so that the City could recoup the $67+ million in refunds from PwC as damages in the *PwC Action*.

Rather than rejecting these allegations out of hand, Judge Berle allowed PwC and its attorneys to conduct discovery of an unprecedented breadth and scope into a wide variety of irrelevant matters including the production of documents, emails and the deposition of the Los Angeles Chief Assistant City Attorney.

<ol start="5">
<li><u><b>The City Attorney Hires Legal Ethicist Ellen Pansky and Attorneys Maribeth Annaguey and Eric George as Critical Participants in Feuer's Campaign to Discredit and Defame Special Counsel by Portraying Paradis and Kiesel in A False Light as "Rogue Actors".</b></u></li>
</ol>

On or about March 6, 2019, both the Debtor and Kiesel withdrew as Special Counsel. Following their withdrawal in the *PwC Action*, however, Gibson Dunn actually ramped up its attacks on the City in the PwC Action and, in particular, on the City Attorney's Office.

The City Attorney responded to these increased attacks by defaming Debtor, claiming that Debtor and Kiesel had been "rogue actors" who had, unbeknownst to the City Attorney and all of the other City Attorney personnel, colluded with Class Counsel in the *Jones* Action. In an effort to imbue the highly defamatory claims that the City Attorney and his Office had leveled against the Debtor and Kiesel with an air of legitimacy, the City Attorney promptly retained the firm Browne George Ross, LLP (along with that firm's partner, Maribeth Annaguey) to replace Kiesel and Debtor as Special Counsel to the City in the *PwC Action*.

The City Attorney and outside counsel, attorney Annaguey and her firm, retained the services of attorney and legal ethicist Ellen Pansky and her firm, Pansky Markle, to purportedly "analyze, evaluate and opine regarding the conduct of all of the attorneys acting under the auspices of the Los Angeles City Attorney's office, in connection with related class action proceedings filed against the City of the (sic) Los Angeles ("COLA") and its Department of Water and Power . . . primarily the case entitled *Antwon Jones v. City of Los Angeles* . . . including the settlement of the *Jones* class action."

The *Pansky Report* was made public in October 2019 and contained highly defamatory statements about the Debtor, including the following:

a. By concurrently providing legal representation to Jones and the City without the informed written consent of either Jones or the City, Paradis violated his ethical and fiduciary duties under CRPC3-3102 to both Jones and the City;

b. By secretly drafting or participating in the drafting of the *Jones v. City* Complaint and failing to reveal his actions to, and/or failing to obtain informed formal consent from the City and Jones, while serving as Special Counsel for the City, Paradis breached his ethical duties to both the City and Jones to refrain from the representation of conflicting interests.

c. By repeatedly misrepresenting that once the City declined to consent to Paradis' and Kiesel's joint representation of the City and an individual ratepayer against PWC, and that as soon as Jones made his decision to sue the City, Paradis' representation of Jones "ended," knowing that he had continued to provide legal services for Jones' benefit, Paradis violated his duty of candor and his duty to refrain from misleading his client, the court, and opposing counsel.

d. By failing to advise their client, the City, that they were continuing to assist Jones in bringing in action against the City, Paradis violated his duty to the City to communicate significant events affecting the client's matter.

City Officials, Pansky and attorneys Annaguey and George had actual knowledge that the *Pansky Report* contained highly defamatory statements about the Debtor. Despite having knowledge of the inaccuracy of these statements, City officials, along with Pansky and attorneys Annaguey and George nevertheless caused the highly defamatory Pansky

Report to be published and thereby caused great financial and reputational injury to the Debtor.

### 6. The City Attorney Further Damaged Debtor by Improperly Interfering with the Aventador Contract and Causing the City to Cancel that Contract "For Convenience".

After Debtor and Kiesel resigned as Special Counsel, the City Attorney and LADWP General Counsel continued their effort to distance the City Attorney's Office from the Debtor and the Debtor's business with the City. The City Attorney and LADWP General Counsel tortiously interfered with Debtor's other business relationship with the City in late March 2019 by directing the LADWP Board to immediately cancel the $30 million Aventador contract by triggering that contract's "cancellation for convenience" clause.

LADWP Board members, however, agreed that the Aventador team would be immediately re-hired by the LADWP if the Debtor immediately sold all of his ownership interest in Aventador in the following 24 hour period and agreed to say that he would not perform any work for Aventador relating to the LADWP in the future.

Under extreme duress to accede to the City's demands in order to save the jobs of the 40+ Aventador employees that the Debtor's company employed, and literally given only 24 hours to do so, the Debtor sold Aventador to Aventador's most highly skilled cyber security professional, who had extensive cyber experience working for both the National Security Agency and the United States Department of Energy, and who held the highest security clearances issued by the United States government. In doing so, Debtor incurred very severe financial damage in order to preserve the jobs and livelihoods of more than forty families.

Just prior to the City's cancellation of the Aventador contract, the Aventador team had completed more than $2.1 million of cyber remediation work at the LADWP during the month of February 2019. Aventador paid its employee's salaries for February 2019

and other expenses, expecting payment of its invoice from the City, which had not—at the time of the work—indicated, in anyway, that Aventador would be terminated.

Because Aventador had performed this work, at the time of the forced "sale" of Aventador in March 2019, the City owed Aventador more than $2.1 million for cyber security consulting services provided to the LADWP by Aventador in February 2019. Significantly, the City, by its outside counsel, admitted in open Court on March 19, 2019 that the City owes the $2.1 million for services rendered, however, the City has refused to pay the invoice because of a Los Angeles County Superior Court order temporarily staying payments to the Debtor and any companies owned by the Debtor. Because, as noted above, Aventador paid all of the employees who performed the work at the LADWP in February 2019, the company has been severely damaged by the company's inability to, thus far, obtain payment from the City for the cyber security services rendered to the City in February 2019.

As detailed in a ***Motion to Lift Injunction*** filed in the Los Angeles County Superior Court on November 13, 2020, the Los Angeles County Superior Court Order staying such payments was entered *sua sponte* without the Superior Court having made any findings whatsoever to support the entry of such Order.[5] Accordingly, Debtor has prepared a Lift Injunction Motion and respectfully intends to request this Court's permission to file that Lift Injunction Motion in the California Superior Court so as to cause the Superior Court to lift its injunction and order the City to pay the $2.1 million due Aventador to Ardent's bankruptcy estate.

---

[5] As discussed during the November 19, 2020 Emergency Hearing conducted by this Court, the Lift Injunction Motion was withdrawn late in the afternoon of November 19, 2020 without prejudice to the Motion being re-filed if Ardent is permitted to do so by this Court once Ardent has filed a request for permission to do so in this Court and this Court has had an opportunity to consider such request.

### 7. **Ardent Is Hired To Remediate Widespread Vulnerabilities in the LADWP's Critical IT Infrastructure.**

After its sale, Aventador's name was changed to Ardent. Given the Aventador team's prior success, the City awarded Ardent an additional contract. On or about April 23, 2019, the LADWP Board of Commissioners voted to formally approve the Contract (Agreement No. 47551A) (the "Ardent Contract"), thereby retaining Ardent to provide cybersecurity consulting services to help the LADWP remediate widespread cyber vulnerabilities that exist in the LADWP's critical infrastructure and business-critical Networks. The contract was a 60-day contract in an amount not to exceed $3,600,000.

As required by the Ardent Contract, Ardent performed work for the LADWP pursuant to several Task Orders (Task Order Nos. 1-4), each requiring that Ardent provide the LADWP with specified cybersecurity service(s) and associated deliverable(s). LADWP accepted this work and paid Ardent for work performed under Task Order Nos. 1-4 during the initial 60-day contract period.

### 8. **On June 18, 2019, the LADWP Amended the Ardent Contract, Extending Ardent's Period of Performance and Compensation.**

On June 18, 2019, the LADWP amended the Ardent Contract to extend the initial term of the contract by an additional sixty days and increased the "not to exceed" amount of the contract by an additional $3,600,000, for a new "not to exceed" contract total of $7.2 million.

During the second 60-day contract period, Ardent performed work for the LADWP under Task Order No. 1B, Task Order No. 4B, Task Order No. 5, and Task Order No. 6, which the LADWP accepted and from which the LADWP benefitted.

**9. In the Early Morning of August 12, 2019, Ardent Informed the LADWP Board and Executive Management that Ardent Had Uncovered the Fact that LADWP and City Officials Have Long Been Engaged in a Wide Variety of Illegal Activities, Including Making Materially False and Misleading Statements to Federal and State Regulators Concerning the LADWP's Purported Physical and Cybersecurity.**

During the course of Ardent's retention, Ardent uncovered the fact that LADWP and City officials have, over the past two decades, been actively engaged in criminal activity involving the:

a.    LADWP's failure to comply with applicable laws and regulations governing physical and cyber security at the LADWP; and

b.    deliberate falsification of regulatory reports and related documentation to make it appear as though the LADWP is in compliance with applicable laws and regulations governing physical and cyber security, when, in fact, the LADWP is not in compliance with such laws and regulations.

Accordingly, in the early morning of August 12, 2019, Ardent's President emailed the LADWP's Board President and several LADWP senior officials, including the LADWP's General Manager, Chief Information Officer and Chief Information Security Officer, that Ardent uncovered the fact that:

i.    the LADWP and the City have been engaged in a pattern and practice of criminal activity that involved making materially false statements and omitting to disclose material facts to federal and state regulators, concerning the extreme lack of physical and cyber security and wide-spread lack of cyber hygiene that has existed at the LADWP for the past two decades;

ii.    contrary to numerous materially false representations and statements made to federal and state regulators, bond rating agencies and purchasers of municipal securities issued by the LADWP, the computer hardware and software that comprises the multiple networks on which the LADWP relies to deliver water and power to millions of Angelinos each day (including the critical Water Network and Power Network), are highly insecure and extremely susceptible to cyber-attack because the LADWP has failed to properly patch, maintain and secure these mission critical Networks (including the

more than 30,000 pieces of computer equipment attached to these mission critical Networks); and

iii. LADWP and City officials, including Mayor Garcetti, have long had ***actual knowledge*** of the extremely dangerous lack of cyber security that exists at the LADWP and its critical infrastructure facilities. However, rather than acting to remedy the extremely dangerous conditions to human life and safety that exist as a result of the LADWP failing to properly patch, maintain and secure these mission critical Networks, LADWP and City have acted to conceal these facts from federal and state regulators, bond rating agencies, purchasers of municipal securities issued by the LADWP and the public at large.

Within mere *hours* of Ardent having informed the LADWP Board President and Executive Management officials of these earth-shattering facts, the Mayor personally acted swiftly, suddenly, and beyond the scope of his authority as Mayor and in violation of law, to immediately suspend Ardent's Contract and remove ***all*** Ardent cybersecurity personnel from LADWP's premises.

Not only did the Mayor, the City and LADWP act in a retaliatory manner against Ardent by suspending Ardent's Contract, but the City and LADWP breached Ardent's Contract by failing to pay Ardent $3,178,600 for work that was satisfactorily performed and completed by Ardent (under the second group of Task Orders)– work that was accepted by the LADWP and from which the LADWP unquestionably has benefitted and also intentionally interfered with Ardent's future economic opportunity by denying Ardent the opportunity to perform an additional $3.6 million of cyber security consulting services despite the City (acting by and through the LADWP Chief Information Security Officer) and Ardent having expressly agreed to do so just days before the Mayor's *ultra vires* actions.

10. **The Damage to Debtor and His Company and Debtor's Projected Income.**

The actions and failures to act described herein, along with other as-yet publicly undisclosed actions and failures to act by City officials, caused Debtor and Ardent to incur millions of dollars in damages and, ultimately to file for bankruptcy protection in June 2020.

In addition, the highly detrimental defamation campaign in which City officials, along with outside counsel, were active participants resulted in the publication of the malicious and highly defamatory statements contained in the Pansky Report, causing the Debtor's reputation as an attorney, contractor, manager and employee to be utterly destroyed. As a result of the actions of City officials, numerous news stories, articles and television news stories have been published attacking the Debtor and painting him in the very false light character conceived of and furthered by these City officials as a result of the wrongful schemes and conduct described herein. Furthermore, Debtor has been wrongfully sued as a result of Pansky, Annaguey and George's false light scheme and as a result of attorneys Pansky, Annaguey and George publishing the highly defamatory statements about the Debtor that are contained in the *Pansky Report*. In 2018 the Debtor earned more than $6 million. As a direct result of misconduct engaged in by City officials and Pansky, Annaguey and George, Debtor lost more than $2 million in 2019 and has completely lost all of Ardent's business, repeatedly been refused employment and has been forced to file bankruptcy as a result of the malicious false light scheme, publication of the highly defamatory statements contained in the *Pansky Report* and the City's wrongful refusal to pay the more than $5.3 million owed to Ardent for the extremely high-quality cyber security services performed by the Aventador and Ardent team.

Debtor is currently employed as a Contract Negotiator and will also provide project management services relating to the implementation of large-scale IT systems. Debtor's operating reports for the period commencing on the Petition Date through October 31, 2020 are attached hereto as Exhibit C. Debtor's projected net disposable

income for the years 2021 – 2023 is approximately $1.3 million and is set forth in <u>Exhibit D</u> attached hereto.[6]

      **11.**      **<u>The City Continues to Engage in Bad Faith and Highly Abusive Litigation Tactics in the Bankruptcy Proceedings Wasting Valuable Assets of the Estate that Should Be Available to Actual Creditors.</u>**

In a stunning demonstration of the City's continued bad faith tactics, the very City officials who have caused Debtor's financial ruin and bankruptcies have now caused the City to file a completely fraudulent Proof of Claim against the Debtor pursuant to which the City claims Debtor owes the City $21.9 million. As Debtor will demonstrate at the appropriate time, the City's Amended Proof of Claim is entirely fraudulent and LADWP General Counsel Joseph Brajevich and Los Angeles Chief Deputy City Attorney Kathleen Kenealy, who signed the City's Proofs of Claim and Amended Proof of Claim under penalty of perjury not only committed perjury, but also violated 11 U.S.C. § 152(4), which makes it a crime to submit a fraudulent claim in this bankruptcy matter. At the appropriate time, Debtor intends to file a contempt motion against the City and the LADWP General Counsel Brajevich and Los Angeles Chief Deputy City Attorney Kathleen Kenealy, and may also request that the Court refer this matter to the United States Attorney's Office for the Central District of California for investigation in connection with the City and these two attorneys having filed these fraudulent Proofs of Claim and Amended Proof of Claim against the Debtor and Ardent.

By engaging in frivolous motion practice and filing the fraudulent Proofs of Claim and Amended Proof of Claim, the City is also further dissipating assets of both the Debtor's and Ardent's estates by causing Debtor and Ardent to use valuable assets that should be available to pay valid claims to instead pay attorneys' fees to defend against the City's filings. In the event that the City does not withdraw its fraudulent Proof of

---

[6] Notwithstanding the amount of Debtor's projected net disposable income, Debtor's actual net disposable income will be contributed to the Plan Fund for distributions to creditors.

Claim and Amended Proof of Claim and cease engaging in such activities, the Debtor and Ardent intend to pursue all relief that may be available to Debtor and Ardent, including asking the Court to refer this matter to the United States Attorney's Office for the Central District of California for investigation.

## B. Liquidation Analysis

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. A liquidation analysis summary is attached to the Plan as Exhibit E.

Debtor's assets are described in Debtor's bankruptcy schedules filed on June 3, 2020 [DE 1] (the "Bankruptcy Schedules") at Bankruptcy Schedules A and B. Debtor is allowed to claim certain property as "exempt" meaning that certain items or values are excluded from the bankruptcy estate and protected from the claims of most creditors. These exemptions are generally considered necessities for the welfare of a debtor and his/her family. § 522 of the Bankruptcy Code provides the statutory basis to exempt assets. Section 522(b)(3) of the Bankruptcy Code requires Debtor to use the exemptions available under California law. The exemptions claimed by Debtor are identified in Bankruptcy Schedule C. Debtor's non-exempt assets include the following:

Tennessee Property. This property is a condominium located at 1212 Laurel Street, Unit 2211, Nashville, Tennessee 37203 (the "Nashville Property"). Debtor has entered into a contract to sell the Nashville Property to Joseph Gordon for the purchase price of $459,900. The net sales proceeds from the sale of the Nashville Property are expected to equal approximately $116,667.[7] The Court approved the sale on November 9, 2020 and the sale is expected to close on or before November 30, 2020.

California Property. This property is a residential property located at 40365 Sand Dune Road, Rancho Mirage, California 92270. Following court approval, Debtor sold

---

[7] See Settlement Statement attached hereto as Exhibit F.

this property to the Karen A. McDonald Trust for the sale price of $3,600,000. The sale closed on November 13, 2020 and a Seller's Final Settlement Statement reflecting all disbursements from escrow is attached hereto as <u>Exhibit G</u>. Debtor's net proceeds equaled $879,625.70 and is being held in undersigned counsel's trust account. The only disbursement from this account is the sum of $16,817.50 paid to the SubV Trustee pursuant to a fee application approved by the Court on November 12, 2020 at DE 168.

<u>Automobile</u>. Debtor is the owner of a 2012 S63 AMG Mercedes automobile (the "Automobile"). Debtor estimates that the current value of the Automobile is $23,544 based on blue book estimates, condition and milage. Debtor claims an exemption in the amount of $3,325.00 and that net of the exemption the automobile has a net value to the bankruptcy estate of $20,219. Debtor intends to retain the Automobile.

<u>Litigation Claims</u>. Debtor has various claims against third parties for defamation which are generally described immediately below and in Debtor's Bankruptcy Schedules at Schedule B, part 33, p. 22 of 70.

Beginning in March 2019 and continuing to the present time, City officials, including numerous attorneys employed in the Los Angeles City Attorney's Office have defamed Debtor and his co-counsel in the *PwC* Action by claiming that Debtor and his co-counsel had been "rogue actors" who had, unbeknownst to the City Attorney and all of the other City Attorney personnel, colluded with Class Counsel in the *Jones* Action. In an effort to imbue the highly defamatory claims that the City Attorney and his Office leveled against the Debtor with an air of legitimacy, the City Attorney enlisted the aid of attorney Maribeth Annaguey, a partner of the Browne George Ross, LLP law firm, along with the services of attorney and legal ethicist Ellen Pansky and her firm, Pansky Markle, to purportedly "analyze, evaluate and opine regarding the conduct of all of the attorneys acting under the auspices of the Los Angeles City Attorney's office, in connection with related class action proceedings filed against the City of the (sic) Los Angeles ("COLA") and its Department of Water and Power . . . primarily the case entitled *Antwon Jones v. City of Los Angeles* . . . including the settlement of the *Jones* class action."

Debtor believes that at the time that the *Pansky Report* was made public in October 2019, City Officials, Pansky and attorney Annaguey had actual knowledge that the *Pansky Report* contained highly defamatory statements about the Debtor. Despite having knowledge of the inaccuracy of these statements, however, City officials, along with Pansky and attorney Annaguey nevertheless caused the highly defamatory Pansky Report to be published and thereby caused great financial and reputational injury to the Debtor. Accordingly, Debtor has filed a lawsuit alleging defamation and invasion of privacy by false light claims and seeks a minimum of $5 million in damages.

Not surprisingly, the City has invested a great deal of effort in attempting to convince the Court that this bankruptcy matter and the Ardent matter should be converted. The City seeks to do so because it is well aware that the only one with knowledge of the events that is required to successfully prosecute this defamation lawsuit is Debtor.

Debtor believes that the defamation claims have very significant value to the Debtor's estate and ae worth several million dollars – and that these claims must therefore be actively prosecuted for the benefit of the estate and its creditors. However, the Debtor further believes that, should this case or the Ardent matter be converted as the City has requested, the Debtor would be forced to cede control over the litigation of the defamation lawsuit to a Trustee who simply lacks the factual background necessary to successfully prosecute the defamation claims. For this reason, the Debtor further believes that these very valuable defamation claims effectively have little to no value unless they are prosecuted by the Debtor.

<u>Recovery Claims</u>. Debtor's Statement of Financial Affairs at DE 1, pages 60-61 identify certain transfers made by Debtor within 2 years of the Petition Date and which are potentially recoverable by Debtor's bankruptcy estate. These transfers include the sale of various real and personal properties during the calendar year 2019. Debtor believes these transfers to be for fair value and are not recoverable. As such, Debtor believes that these potential claims have no value. The transfers also include capital contributions made by Debtor to Ardent and to PLG in the amounts of $1,902,636.44 and $2,672,129.58,

respectively. Debtor does not believe that any successful recovery claim will be collectable from PLG and has attributed no value to this potential recovery claim. Notwithstanding the foregoing, and subject to Court approval, PLG will stipulate to a judgment in favor of the Debtor's estate for the recovery of the capital contributions in the amount of $2,672,129.58. Additionally, subject to Court approval, Ardent will stipulate to a judgment in favor of the Debtor's estate for the recovery of the capital contributions in the amount of $1,902,636.44 and for the sums advanced by Debtor in the approximate amount of $15,490.16 to the Ardent estate in the ordinary course. This claim would only have value to the extent the City/LADWP $5,200,000 receivable is paid to Ardent's estate. For purposes of a liquidation analysis, Debtor does not attribute any value to the City receivable.

Ardent Receivable. Debtor is owed $500,000 from Ardent and is a creditor in Ardent's bankruptcy case. This claim would only have value to the extent the City/LADWP $5,200,000 receivable is paid to Ardent's estate. For purposes of a liquidation analysis, Debtor does not attribute any value to the Ardent receivable. Debtor does not expect any distribution from Ardent with respect to Debtor's equity interest in Ardent.

Debtor estimates that, based on Debtor's bankruptcy schedules and after reconciliation with the filed claims, after resolution of Disputed Claims[8], there will be $38,282.80 in allowed priority non-tax claims (Lisa Paradis), approximately $2,000,000 in allowed priority tax claims (IRS and California Franchise Tax Board) [9], and $1,792,465,90 in allowed unsecured claims.

The liquidation analysis attached as Exhibit E, identifies all of Debtor's assets, estimated value of such assets, liens on his assets, claimed exemptions, and the estimated

---

[8] See Section 5.1 below.

[9] This amount is determined based on expected resolution of the pending tax dispute which includes reconciliation of the 2018 audit and application of available net operating losses.

net liquidation value of the assets. If Debtor's case converted to chapter 7 of the Bankruptcy Code, a chapter 7 trustee would be appointed to liquidate available assets. The trustee's fees, the trustee's attorneys' fees, if any, and any other administrative expenses of the chapter 7 estate and the chapter 11 estate, together with any applicable liens, would be deducted from the liquidation proceeds. The remaining funds would be available for distribution to creditors.

Debtor's Liquidation Summary is estimated as follows:

- Chapter 11 Plan: $2,295,625.70 is the amount Debtor estimates will be paid into the Plan for distribution to administrative, priority, secured, and unsecured creditors, exclusive of sums received from the Ardent Judgment, the PLG Judgment, the Pansky Claims, and the Ardent Receivable but inclusive of Debtor's projected Net Disposable Income.

- Chapter 7: $995,625.70 is the amount Debtor estimates would likely be produced from liquidation for distribution to administrative, priority, secured, and unsecured creditors and which does not include any value from distributions received from Ardent or from the Ardent Judgment, Pansky Claims, or PLG Judgment. This amount would pay all administrative claims, would not pay in full priority claims, and would result in no distribution to unsecured creditors.

**C.     Ability to Make Future Plan Payments and Operate Without Further Need for Reorganization.**

The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments and operate the debtor's business. Debtor will liquidate and contribute available assets to the Plan for distribution to creditors including the proceeds from the sale of the California Property and the Tennessee Property together with any recoveries on the Ardent Receivable, the Recovery Claims (including any recoveries on the Ardent Judgment and the PLG Judgment), and the Litigation Claims ("Available Assets") as contemplated § 1191(c)(2)(B) of the Bankruptcy Code. Debtor does not believe the Bankruptcy Code requires the Debtor's contribution of his net disposable income as a result of the contribution of the Available Assets. Notwithstanding the foregoing, Debtor will contribute to the Plan his disposable income, as defined in § 1191(d) of the Bankruptcy Code net of applicable taxes and

withholdings ("Net Disposable Income"), for up to 3-years. If, after 3 years following the Effective Date of the Plan, the distributions to creditors from the Available Assets and 3-years of Debtor's Net Disposable Income, are insufficient to pay all administrative claims and allowed priority claims in full, Debtor will contribute up to 2 additional years of Net Disposable Income to the extent necessary to pay in full the allowed priority claims within 5 years of the Petition Date. Net Disposable Income will be contributed into the Plan Fund quarterly.

The proceeds for the liquidation of Available Assets from Debtor's estate together with Debtor's Net Disposable Income will be deposited into a Plan Fund under the control of and subject to distribution from the SubV Trustee. Debtor estimates that $2,295,625.70 will be generated from the liquidation of Available Assets and from Debtor's Net Disposable Income and made available to creditors and holders of administrative claims. Debtor also estimates that substantial additional sums could be received by the Plan Fund from the prosecution of the Pansky Claims and the collection of the Ardent Judgment and the Ardent Receivable.

The final Plan payment is expected to be paid on or before a date which is five (5) years from the Effective Date of the Plan. Any Available Assets or Net Disposable Income not liquidated or contributed as provided in and following performance of the Plan shall revest in Debtor.

**You should consult with your accountant or other financial advisor if you have questions pertaining to these projections.**

**II.     THE PLAN.**

**Article 1: Summary**

This Plan proposes to pay creditors of Debtor from the Available Assets.

This Plan provides for the following classes of claims:

> One (1) class of priority claims (2 other priority tax claims are unclassified).
> Five (5) classes of secured claims.
> One (1) class of non-priority unsecured claims.
> One (1) class of equity security interests.

This Plan provides for the payment in full of allowed administrative and priority claims. Due to the extent of the administrative and priority claims, distributions to non-priority unsecured creditors holding Allowed Claims will depend on the liquidated amounts from Available Assets.

All creditors and equity security holders should refer to Articles 3 through 6 of this Plan for information regarding the precise treatment of their claim. **Your rights may be affected. You should read these papers carefully and discuss them with your attorney if you have one. (If you do not have an attorney, you may wish to consult one.)**

**Article 2: Classification of Claims and Interests**

2.01 **Class 1** All allowed claims entitled to priority under § 507(a) of the Bankruptcy Code (except administrative expense claims under § 507(a)(2) and priority tax claims under § 507(a)(8)) including the following:

  A.   The claim of Lisa Paradis.

2.02 **Class 2** All secured claims to the extent allowed under § 506 of the Bankruptcy Code.

  A.   The claim of Ameris Bank secured by the Tennessee Property.

  B.   The claim of Axos Bank secured by the California Property. This claim has been paid in full from the gross proceeds of the sale of the California Property.

  C.   The claim of Riverside County Treasurer secured by the California Property. This claim has been paid in full from the gross proceeds of the sale of the California Property.

  D.   The claim of Thunderbird Property Owners Association secured by the California Property. This claim has been paid in full from the gross proceeds of the sale of the California Property.

  E.   The claim of Bank of America secured by the 2018 Cadillac Escalade.

2.03 **Class 3** All non-priority unsecured claims allowed under § 502 of the Bankruptcy Code.

2.04 **Class 4** Interests of the Debtor in property of the estate.

**Article 3: Treatment of Administrative Expense Claims, Priority Tax Claims, and Quarterly and Court Fees**

**3.01 Unclassified claims**

Under § 1123(a)(1) of the Bankruptcy Code, administrative expense claims, and priority tax claims are not in classes. These claims include the following:

> A.   The claim of the Internal Revenue Service.
>
> B.   The claim of the California Franchise Tax Board.

**3.02 Administrative expense claims**

Each holder of an administrative expense claim allowed under § 503 of the Bankruptcy Code, will be paid in full on the Effective Date of this Plan, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor.

**3.03 Priority tax claims**

After the payment to Lisa Paradis, each holder of an allowed priority tax claim will be paid first from Available Assets and Debtor's Disposable Income on before a period which is not greater than five (5) years following the Petition Date in accordance with § 1129(a)(9)(C). Any sums outstanding amounts owing as of a date which is five (5) years following the Petition Date will be paid in full on such date.

**3.04 Statutory fees**

All fees, if any, required to be paid under 28 U.S.C. § 1930 that are owed on or before the effective date of this Plan have been paid or will be paid on the Effective Date. Debtor is not aware of any such statutory fees.

**3.05 Prospective quarterly fees**

All quarterly fees, if any, required to be paid under 28 U.S.C. § 1930(a)(6) or (a)(7) will accrue and be timely paid until the case is closed, dismissed, or converted to another chapter of the Code. Debtor asserts that no quarterly fees will be due.

**Article 4: Treatment of claims and interests under the plan**

4.01 **Claims and interests shall be treated as follows under this Plan:**

| Class | Impairment | Treatment |
|---|---|---|
| Class 1-Priority Claims excluding those in Article 3 | ☒ Impaired<br>☐ Unimpaired | Lisa Paradis will be paid $38,282.80 on the Effective Date, subsequent to the payment of Administrative Claims, from the Available Assets, and prior to the payment to Classes 3 and 4. |
| Class 2A – Secured Claim of Ameris Bank | ☒ Impaired<br>☐ Unimpaired | Ameris Bank will be paid the full amount of its Allowed Secured Claim including interest, reasonable attorneys' fees, and other approved charges to which the bank is entitled to under its loan documents from the sale proceeds of the Tennessee Property. Ameris Bank's lien will be attached to and satisfied by the sale proceeds. To the extent, this claim is not satisfied in full on or before a date which is 6 months following the Effective Date, Ameris Bank shall be entitled to stay relief to pursue all available rights and remedies which relief shall be set forth in the Confirmation Order. |
| Class 2B – Secured Claim of Axos Bank | ☐ Impaired<br>☒ Unimpaired | Axos Bank has been paid the full amount of its Allowed Secured Claim including interest, reasonable attorneys' fees, and other approved charges to which the bank is entitled to under its loan documents from the sale proceeds of the California Property. |
| Class 2C – Secured Claim of Riverside County Treasurer | ☐ Impaired<br>☒ Unimpaired | Riverside County Treasurer has been paid the full amount of its Allowed Secured Claim including interest, reasonable attorneys' fees, and other approved charges to which the treasurer is entitled to by law from the sale proceeds of the California Property. |
| Class 2D – Secured Claim of Thunderbird Property Owners Association | ☐ Impaired<br>☒ Unimpaired | Thunderbird Property Owners Association has been paid the full amount of its Allowed Secured Claim including interest, reasonable attorneys' fees, and other approved charges to which the association is entitled by law from the sale proceeds of the California Property. |
| Class 2E – Secured Claim of Bank of America | ☒ Impaired<br>☐ Unimpaired | Debtor hereby surrenders to the secured creditor its collateral. If there is a deficiency after the creditor sells the |

| | | |
|---|---|---|
| | | vehicle, such deficiency shall be treated solely as a non-priority, unsecured claim in Class 3. |
| Class 3 – Non-priority unsecured creditors | ☒ Impaired ☐ Unimpaired | Each holder of an allowed unsecured non-priority claim will be paid, subsequent to the payment of Allowed Administrative, Priority and Secured Claims from the net proceeds available from the Available Assets. |
| Class 4 – Equity security holders of the Debtor | ☒ Impaired ☐ Unimpaired | Debtor shall retain all assets not liquidated for distribution to creditors under the Plan as Available Assets, and such assets shall be re-vested in Debtor upon confirmation of the Plan in accordance with §1141(b) of the Bankruptcy Code. |

## Article 5: Allowance and Disallowance of Claims

### 5.01 **Disputed claims**

A *disputed claim* is a claim that has not been allowed or disallowed by a final nonappealable order, and as to which either:

> (i)    a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or
>
> (ii)    no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

Objections to claims, except for those Claims more specifically deemed Allowed in the Plan, may be filed by Debtor or any party in interest up to and including thirty (30) days following the entry of the Confirmation Order. Debtor has already filed objections to the tax claims of the Internal Revenue Service (claim nos. 1-1 and 1-2) and the California Franchise Tax Board (claim no. 17) based on the new rules permitting NOL's to be applied retroactively to previous years income and reconciliation of the 2018 tax year audit.

Debtor also objects to the following claims:

> (A)    claim no. 15 filed by Antwon Jones in the amount of $20,000,000 and the duplicative claim no 16 also in the amount of $20,000,000;
>
> (B)    claim no. 10 filed by Strategic Cyber Holdings, LLC in the amount of $3,409,000;

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(C)    claim no. 9 filed by CyberGym Control Ltd. in the amount of $335,000;

(D)    claim no. 14-2 filed by the City of Los Angeles in the amount of $21,900,000.

Debtor also reserves the right to request an estimation of disputed claims for purposes of confirmation.

5.02 **Delay of distribution on a disputed claim**

No distributions will be made on account of a disputed claim unless such claim is Allowed by a final non-appealable order. Any proposed distribution on account of such disputed claims shall be held by the trustee or Debtor pending resolution of the objection.

5.03 **Settlement of disputed claims**

Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

**Article 6:      Provisions for Executory Contracts and Unexpired Contracts and Leases**

6.01 **Assumed executory contracts and unexpired leases**

(a)    The Debtor assumes, and if applicable assigns, the following executory contracts and unexpired leases as of the effective date: Debtor's lease of premises located at 4422 N. 75th St., Unit 4005, Scottsdale, AZ 85251.

(b)    Except for executory contracts and unexpired leases that have been assumed, and if applicable assigned, before the effective date or under section 6.01(a) of this Plan, or that are the subject of a pending motion to assume, and if applicable assign, the Debtor will be conclusively deemed to have rejected all executory contracts and unexpired leases as of the effective date.

A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than 30 days after the date of the order confirming this Plan.

**Article 7: Means for Implementation of the Plan**

Debtor shall establish a Plan Fund for the management of all funds for distribution to creditors and claimants. The Plan Fund shall be administered by the Subchapter V Trustee and Debtor shall make deposits into the Plan Fund from the net proceeds received from the proceeds of the Available Assets. Initial distributions under the Plan shall be made on or before thirty (30) days following the Effective Date. Thereafter, distributions shall be made as determined by the SubV Trustee. If Debtor fails to make any payment required under the Plan, Debtor will not be granted a discharge pursuant to 11 U.S.C. § 1192, the Court, after notice and a hearing as defined in 11 U.S.C. § 102(1), may dismiss this case with prejudice precluding Debtor from filing a chapter 11 bankruptcy petition for a period of one year following dismissal, and all creditors shall be entitled to exercise all available state law rights and remedies.

**Article 8: General Provisions**

8.01 **Definitions and rules of construction**

The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Code are used in this Plan.

8.02 **Effective Date**

The effective date of this Plan (the "Effective Date") is the first business day following the date that is 14 days after the entry of the confirmation order. If, however, a stay of the confirmation order is in effect on that date, the effective date will be the first business day after the date on which the stay expires or is otherwise terminated.

8.03 **Severability**

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

8.04 **Binding effect**

The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of the successors or assigns of such entity.

8.05 **Captions**

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

8.06 **Controlling effect**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Bankruptcy Rules, the laws of the State of Arizona govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

8.07 **Retention of Jurisdiction**

The Bankruptcy Court shall retain jurisdiction of this case pursuant to the provisions of the Bankruptcy Code, including the final allowance or disallowance of all Claims affected by the Plan, and to make such orders as are necessary or appropriate to carry out the provisions of this Plan.

8.08 **Re-Vesting of Property in Debtor**

Except as required to implement the Plan, the entry of an order confirming the Plan vests all property of the estate in the Debtor in accordance with § 1141(b) of the Bankruptcy Code. Any Available Assets or Net Disposable Income not liquidated or contributed as provided in and following performance of the Plan shall revest in Debtor.

**Article 9: Discharge**

If the Debtor's Plan is confirmed under § 1191(a) of the Bankruptcy Code, on the effective date of the Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Bankruptcy Code. The Debtor will not be discharged from any debt:

(i)     imposed by this Plan; or

(ii)    excepted from discharge under § 523(a) of the Bankruptcy Code,
                            except as provided in Rule 4007(c) of the Bankruptcy Rules.

        If the Debtor's Plan is confirmed under § 1191(b) of the Bankruptcy Code,

confirmation of the Plan does not discharge any debt provided for in this Plan until the

court grants a discharge on completion of all payments due within the first 3 years of this

Plan, or as otherwise provided in § 1192 of the Bankruptcy Code. The Debtor will not be

discharged from any debt:

                    (iii)   on which the last payment is due after the first 3 years of the plan, or
                            as otherwise provided in § 1192; or

                    (iv)    excepted from discharge under § 523(a) of the Code, except as
                            provided in Rule 4007(c) of the Federal Rules of Bankruptcy
                            Procedure.

        RESPECTFULLY SUBMITTED this 25th day of November 2020.

                                                    **BURCH & CRACCHIOLO, P.A.**

/s/ Paul Oliva Paradis                      /s/ Alan A. Meda (#009213)
Paul Oliva Paradis                          Alan A. Meda
*Debtor*                                    *Attorney for Debtor*

COPY served via ECF on CM/ECF
users this 25th day of November 2020,
which constitutes service pursuant
to L.R. Bankr. P. 9076-1:

 /s/ Tracy Dunham
Tracy Dunham